## Lampton v. Staebler et al.

(Decided Jan. 19, 1934.)

406

WOODWARD, HAMILTON & HOBSON and WILBUR FIELDS for appellant.

EUGENE R. ATTKISSON and J. H. GOLD for appellees.

OPINION OF THE COURT BY JUDGE PERRY—Affirming.

About July 15, 1927, the Mystic Stone Quarries Company (hereinafter referred to as the quarries company) was organized and bought from S. W. Davis his rock quarry property at Mystic, Ky.

In addition to the vendor's lien retained by Davis to secure the payment of the company's series of purchase-money notes aggregating $25,000, Davis insisted that the first five of these notes, totaling $7,000, should also be personally secured by the stockholders of the company. In compliance. with this requirement, the first five of these notes were signed by C. A. Staebler, G. T. Dick, Charles Frank, Glen Compton, and the appellant, Clark S. Lampton, as sureties.

Simultaneously with their signing of these notes as sureties, an agreement was entered into between the quarries company and G. T. Dick, one of the sureties, which it is clearly shown was made for the benefit of all the sureties on these notes, whereby the St. Matthews Bank & Trust Company of St. Matthews, Ky. (of which G. T. Dick was cashier) was appointed trustee. The contract mentioned the conveyance by Davis of said property and equipment to the quarries company, for which, it recited, the company made, among others, these five said notes, aggregating $7,000, and maturing between July 15, 1927 (date of contract), and July 15, 1928, and provided that a royalty of 12½ cents per ton of the stone sold by the company should be applied by the trustee as credit on said notes up to the amount thereof and interest. It further provided that, in consideration of Dick having signed these notes as surety, the quarries company bound itself to make weekly report to the trustee of the total amount of stone sold, and to deposit weekly all receipts for stone sold with the said bank as trustee, which the bank was to divide and deposit the 12½ cents per ton to the sinking fund account and the balance to the checking account of the company.

The quarries company thereupon took over and began to operate the newly acquired quarry and, pursuant to such arrangement, placed its banking account with the said St. Matthews Bank & Trust Company, as trustee, which, out of the deposits thus made with it of the 12½ cent stone royalty, took up the first three of these five personally secured notes, amounting to some $3,500, as they matured.

In the early part of the year 1928, a breakdown occurred at the quarry, causing it to close down for some months for repairs; also, a quarrel arose between Lampton and the appellee Staebler, who were associated as officers in the management of the quarry, when Staebler severed his connection with the quarries company and returned to St. Matthews, whereupon the appellee G. T. Dick also termniated his connection with the company (as he had only gone into it, according to his testimony, to assist his friend Staebler) and also his banking relations with it. Thus the stone quarries company's account was closed with the St. Matthews Bank & Trust Company and moved elsewhere, after which no further rock royalties were paid it, as called for by the contract.

It further appears that, upon Staebler quitting the quarry, Lampton became its president and assumed the sole and complete control of its affairs and management from such time until it was in June, 1930—some two years later—adjudged bankrupt, when it paid no dividend to any general creditor.

Upon the said trustee bank's closing of the quarries company's bank account carried with it and its refusal to make it further advances to meet its pay rolls and current expenses, Lampton states that he was thus forced to open up an account for the company with another bank, and that, during this period in 1928 when the quarries company was closed, he undertook to keep it going by advancing and lending the company the necessary operating and repair funds out of his personal means, and in such way he then and thereafter advanced it practically his entire private fortune in an attempt to keep it a going concern, and that upon the fourth of these personally secured notes for $1,500 coming due May 15, 1928, when the company had no funds with which to meet the same, he (Lampton) paid the said note out of his own funds for the company, and that again on July 15, 1928, the last of said five notes, which was for $2,000, becoming due, he made arrangements to pay it.

The evidence shows that, on September 18 following, the quarries company having at that time certain rock sale proceeds on hand, Lampton had it pay to him the sum it had of $1,794, as a credit upon $2,000 then owing him by the company and, depositing said check

to his personal credit, he paid Davis this note and interest, amounting to $2,021, with said amount paid him plus the sum of $227, which he advanced from his personal funds. It is further admitted that, after Lampton left the trustee bank and made new banking connections, he did not thereafter deposit any stone royalties with the St. Matthews Bank & Trust Company, as provided for under the sinking fund contract, though he did continue to report to it the weekly royalties due it upon the stone sold and delivered by the company up until about the 1st of September, 1928, and that same, computed upon the stone sold to that time, then amounted to $1,177.49, which, though reported, was never by the company, acting under Lampton's sole control, paid over to it.

After the final failure and adjudged bankruptcy of the quarries company, Lampton, in December, 1930, filed suit against the appellees Staebler and Dick, and also Glen Compton and Charles Frank, as cosureties upon these two notes of $1,500 and $2,000, due May 15 and July 15, 1928, respectively, which he alleged, as above set out, he had paid as a cosurety with the defendants for the insolvent company, seeking contribution from them, as such, in the amount of $2,800 or four-fifths of the $3,500 so paid by him.

He thereafter filed an amended petition dismissing the action as to the defendants Compton and Frank, alleging that his suit against them for contribution was due to a mistake, for the reason that he had in January, 1928, released them as cosureties upon these notes, but still seeking judgment against the appellees Dick and Staebler for $700 each.

These remaining cosureties and defendants then filed answer, by which they pleaded that payment of the two notes sued on had been made by the quarries company, not Lampton, and further that Lampton had, by releasing the two cosureties, Frank and Compton, from liability on the notes, thereby released them as sureties, and that, as the said notes were secured by a lien, which had been enforced, and appellant had permitted the proceeds of its sale to be wholly paid upon the other notes secured by the lien, without applying any part thereof to the lien notes here sued on, the defendant sureties were thereby released from liability.

To this answer reply was filed, making up the is-

sues, when the case was referred to the official stenographer and the burden of proof placed by the chancellor on the defendants.

Proof was then taken by them, when the plaintiff, deeming it insufficient—without himself taking proof—sought to have the cause submitted in chief.

Defendants objected to submission and asked to file an amended and supplemental answer, counterclaim, and set-off, which the court, over plaintiff's objection, permitted them to file.

By this amended pleading the defendants set out the sinking fund agreement made between the quarries company and G. T. Dick, the defendant, providing for the royalty deposit of 12½ cents a ton on stone sold by the company with the trustee bank as a sinking fund for the retirement of the five notes signed and personally secured by Staebler, Dick, Frank, Compton, and Lampton, as sureties. It further alleged that, while sufficient royalties had been deposited by the quarries company with the trustee bank, pursuant to the provisions of this sinking fund contract, to retire the first three of these five personally secured notes mentioned in the contract, no royalties were thereafter deposited by the company to be applied to the like satisfaction of the last two notes sued on, as was by the company contracted for. It further set out the number of tons of stone the company had reported it had sold between May, 1928, and the end of August following, on which the royalties amounted to $1,177.49, which amount should have been, but was not, paid to the trustee to be credited on the notes sued on. Also it alleged that, during this period of the company's operation and breach of its agreement to deposit royalties, Lampton had become president of the company and was in sole and complete charge of its affairs, and that the money derived from the company's sale of its stone was elsewhere deposited and disbursed by him, with the result that, within the contemplation of the aforesaid trust contract, Lampton had wrongfully diverted the said royalty money under his control, contrary to the provisions of the contract and with full knowledge thereof, and that appellees, as his cosureties, were therefore entitled to have said reported sum of $1,177.49 credited on the notes sued on, and that plaintiff was, by reason of his causing this diversion, estopped to claim contribution to that extent.

The trial court, while permitting this pleading to be filed, directed that it be made more certain and specific, when appellees filed a second amended and supplemental answer, counterclaim, and set-off, wherein they specifically set out and alleged that, in addition to these royalties, reported by Lampton as accruing and due the sinking fund upon the stone sold by the company to date of September 1, 1928, the company (it is admitted) thereafter sold such further amount of stone between said date and June, 1930, when it failed, and during which period it continued under the sole control of Lampton, as was sufficient to provide additional royalties of something over $3,000, which, had they, with the reported $1,177.49 royalties, been paid to the trustee and applied as agreed, would have been more than sufficient to have satisfied the two notes, aggregating $3,500, upon which Lampton here sued for contribution. They further pleaded that the sinking fund contract made by Dick with the company was made and intended for the benefit of all the defendant sureties.

Issues being formed and proof again taken, the cause was submitted for judgment upon the exceptions to the proof and in chief, when it was adjudged that the petition be dismissed at plaintiff's cost.

This judgment was, upon plaintiff's motion, later set aside, because of the court's failure to pass upon the exceptions and also because the court found itself in error as to certain facts, as to which the court directed further proof to be taken, and also passed upon the exceptions to the testimony.

The cause being then resubmitted for judgment, the court handed down a corrected and extended opinion, in which it again adjudged that the petition be dismissed at plaintiff's cost.

Appellant urges for reversal of the judgment:

(a) That the court erred in permitting the defendants to file amended answer, counterclaim, and set-off after the evidence had been closed and in then proceeding to try the case on the new issues presented by those pleadings.

(b) That the court erred in holding that the Mystic Stone Quarries Company was obligated to continue to deposit royalties with the St. Matthews Bank & Trust

Company under the terms of the Dick contract after that bank had refused to carry the deposit.

(c) That the court erred in holding that the Mystic Stone Quarries Company was obligated to deposit royalties under the terms of the Dick contract when it was impossible to do so and operate the company.

(d) That the court erred in holding that it was the personal duty of Lampton to see that the corporation carried out its contract with Dick.

(e) That the obligation of the contract as construed by the court is contrary to law.

(f) That the court erred in holding that the breach of the Dick contract by the quarries company in its failure to make deposits of royalties after the bank had closed its account with the quarries company precluded or barred Lampton from maintaining an action for contribution against his cosureties on the note.

First, considering point (a), that the court erred in permitting the filing of the supplemental pleadings after (appellant contends) the evidence had been closed and the case was ready for submission, it is to be observed that this was a suit for contribution against cosureties, made upon the ground that plaintiff had himself paid and taken assignment to himself of the notes owing by their principal, the quarries company, which was then insolvent. The existence of these alleged facts, upon which plaintiff's claim rested, was denied by the defendants, with the result that the burden then changed and rested upon plaintiff to establish that these traversed allegations of his petition were true. Despite this burden thus resting upon plaintiff, he had taken no proof in their support, and was therefore not in position to urge the submission of the cause, nor prejudiced by the court's refusal to submit, when defendants objected and were allowed to file these supplemental pleadings. We are, therefore, not inclined to conclude that the court erred in allowing the pleadings to be filed, as the same was but the exercise of its judicial discretion as authorized under the provisions of section 134 of the Civil Code of Practice to the effect that:

"The court may, at any time, in furtherance of justice, and on such terms as may be proper, cause or permit a pleading or proceeding to be amended

"\* \* \* if the amendment do not change substantially the claim or defense, by conforming the pleading or proceeding to the facts proved. \* \* \* The court must, in every stage of an action, disregard any error or defect in the proceedings, which does not affect the substantial rights of the adverse party; and no judgment shall be reversed or affected by reason of such error or defect."

This court has repeatedly interpreted and construed this Code section and uniformly held that the only limitation upon the court's exercise of its discretion in allowing amended pleadings is that they must be in furtherance of justice and must not change substantially the claim or defense; and that, where substantial rights are not prejudiced, errors will be ignored in the trial court's exercise of its given broad discretion in allowing amendments to be filed. Palmer v. Smith, 204 Ky. 82, 263 S. W. 773; Greer v. City of Covington, 83 Ky. 410, 2 S. W. 323, 7 Ky. Law Rep. 419; First State Bank of Monterey v. Vories, 195 Ky. 96, 242 S. W. 18; Stewart v. Stovall, 202 Ky. 367, 259 S. W. 721. And, further, that, although the trial court may commit error, yet, if upon the whole case it does not appear to have substantially prejudiced the rights of the complaining party, it will not constitute reversible error. Chesapeake & O. Ry. v. Conley, 136 Ky. 601, 124 S. W. 861; Lindsey v. Smith, 131 Ky. 176, 114 S. W. 779; Morgan v. Sparkman, 143 Ky. 27, 135 S. W. 408.

We therefore conclude that, as to this contention, the court did not abuse its discretion or err to the substantial prejudice of appellant in here allowing the complained of pleadings to be filed.

Appellant's next objection, (b), is that the court erred in holding that the quarries company was obligated, by reason of the contract, to continue to deposit royalties with the bank trustee after that bank had refused to carry its deposit.

As to this, we may say that the evidence does not show that the trustee refused to carry or receive these royalties on deposit, though Mr. Dick does testify that, after Staebler left the quarries company, he thought he had better drop the quarries account. It appears that he had been through the trustee bank handling the company's expense account while Staebler was with it, but, upon his leaving, had concluded that the account was

then undesirable and risky, and so terminated it. It is not shown that the bank was under any obligation or contract to lend the quarries company expense money or carry a loan account with it, or that its failure to continue such relationship was a breach by the bank of any contract had with the quarries company to so accommodate the company, or that the bank, through its discontinuance of the accommodation, rendered impossible the performance by the company of its contract made with Dick, its cashier, to deposit rock sale royalties with it until the five notes signed by the cosureties, amounting to $7,000, were thereby satisfied.

Lampton states that the company was left in such condition, by reason of the bank's failure to longer carry its account, that it was impossible for it to pay out of the rock sale proceeds the contracted royalties, and yet have sufficient funds left with which to run the business; and that this situation was caused by the action of the bank in breaking its alleged agreement to finance the company, and therefore relieved the company from its obligation under the contract to continue depositing royalties with it.

We do not regard this contention as meritorious, for, while it was not incumbent upon the appellant, Lampton, to continue vicariously emptying his private means into the quarries company's empty treasury for the purpose of continuing to operate it, or in the hope of saving his heavy investment therein by desperately striving to keep it a going business, yet, if he chose to do so, believing in the ultimate success of the company, he took the risk, subject to the right of his cosureties, under the contract made for their benefit, to have the agreed royalties paid to the bank trustee out of the company's gross sales receipts, as provided, whether or not they could be conveniently spared therefor by the company; for, when Lampton became the president of the company and assumed complete charge and control of its affairs, he thereby assumed and became charged with the responsibility and duty of respecting the rights of his cosureties upon the company's notes to have the stone royalty paid into the sinking fund, as was contracted for in consideration of their becoming sureties upon its notes. It thus results that, as Lampton failed to so use the funds of the company as to comply with the terms of its contract to deposit the royalties, when he was in sole control of them, but used his power and

control over the company and its receipts for stone sold to divert these accumulated royalties to other purposes and uses, he thereby breached the contract and violated his duty owing his cosureties, with the result that, upon his later suing them for contribution upon the notes he claimed to have personally paid, the learned chancellor rightly held that he came into court with unclean hands, barring his right thereto, in that had he, as duty bound, carried out the company's contract by depositing the royalties as thereby provided for, ample trust funds would have been accumulated with which to have fully satisfied the notes sued upon and to have discharged them in the way and manner contracted for, without hurt or injury to defendant sureties.

The several further objections (c), (d), (e), and (f), separately urged, may yet be considered as substantially one in that they are substantially embraced in appellant's one general contention that the court erred in holding that the breach of the Dick contract by the quarries company, through its failure to report and deposit stone sale royalties with the trustee bank, after the latter had closed its account with the quarries company, barred Lampton from maintaining this action for contribution. The court so held upon the ground that Lampton had breached the company's contract and failed to keep faith with his cosureties.

The learned chancellor, after considering the whole case upon both the pleadings and proof, concluded that the case presented only the question of the right of a cosurety on two notes to have contribution from his cosureties, where the principal maker was insolvent and the plaintiff surety had paid its notes, and that, it being admitted that the law is that ordinarily such a right to contribute exists, the only questions presented by the record are: (1) Has the plaintiff himself paid the two notes? And (2) has he been guilty of any conduct which would defeat his right to contribution?

In a well-considered opinion, the learned chancellor disposed of these questions as follows:

"Although Lampton's testimony makes it clear that during this period [after January, 1928] the company was not making money [unless the salary paid to him be counted as profit], this does not excuse the failure to make the payments called for by the sinking fund agreement. That agreement did

not provide that those payments should be made out of profits but provided that they should be made, each week, out of gross receipts from sales of stone, at the rate of 12½ cents per ton. * * *

"Even if the company was not making money enough to discharge all of its other obligations, Lampton, acting for the company had no right to divert money which was impressed with a trust in favor of these sureties to satisfy other obligations. These sureties had lent their credit to the quarries company upon a condition. That condition was broken. If Lampton was to blame for the company's breach of its contract, then I think this must have a fatal effect upon his right to recover in this action.

"The relationship between cosureties is one of mutual trust and confidence. If that confidence is betrayed by one of the sureties by a voluntary relinquishment of security given by the maker of the note for the protection of all of the sureties, or if by negligence or otherwise he causes the loss of such security when it is in his control, he forfeits his right to contribution from his co-sureties, at least to the extent of the value of such security. * * * It has been said that this right [to contribution] arises from the maxim that 'Equality is equity'. Consequently, it is frequently held that no right to contribution exists where it would be inequitable to grant it. While the failure to perform the obligation of the sinking fund agreement was, on its face, a failure on the part of the quarries company, it was nevertheless brought about by Lampton himself. He is asking to enforce a right which has its foundation solely in a maxim of equity. He owed a confidential duty to his co-sureties. He was disloyal to them and failed to discharge that duty."

Further, the court in its extended opinion, speaking to these same points, thus continues:

"It is claimed by Lampton that no royalties were payable after the Davis notes were paid off on September 18, 1928, since the only purpose of the sinking fund agreement was to create a fund for the payment of these notes. Upon the other hand, it is claimed by the defendants that the purpose and

effect of the sinking fund agreement was to require the payment of such royalties until the notes had been paid by the company.

"It seems to me that the latter is the correct view. The company was primarily liable for the payment of the notes and the sinking fund agreement was intended as a protection, to the sureties by requiring the company to make these monthly payments. So long as the company's business was being operated and the liability of the sureties continued, it was certainly the duty of the company to make those payments. The circumstance that the company was losing money during its later operations and that Lampton was supplying the funds to enable it to go on did not relieve the company of the duty to continue these payments. Lampton, who had become president of the company and seemed to be in complete charge of its affairs, says that he continued to lend money to the corporation because he believed the business would succeed. When he did this, he assumed the risk involved in the transaction and had no right to abrogate the agreement between the company and its sureties. He knew, when he made these loans to the company, that there was an obligation to pay these royalties, not out of net profits, but out of gross receipts. He could not, without the consent of the sureties, make loans to the company which would have preference over their rights under the sinking fund agreement. If he paid these notes with his own money, he was entitled to contribution from his co-sureties but he had no right so long as the company was in operation to deprive them of the security which that agreement gave them, merely because Davis had received payment from him."

Approving of these conclusions and the supporting reasons therefor thus advanced by the learned chancellor, and finding them expressive of our views, as properly and adversely determining the questions here presented by appellant's contention that the court erred in so ruling, it follows that the chancellor's judgment in so holding should be, and it is, affirmed.